# In the United States Court of Federal Claims

No. 26-506
(Filed: June 24, 2026)
(Reissued July 2, 2026)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SEABEE CONSTRUCTION, INC.,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant*,

and

ALPINE CONSTRUCTION MANAGEMENT, LLC,

       *Defendant-Intervenor*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Jonathan A. DeMella*, Seattle, WA, with whom was *Matthew C. Gurr*, for plaintiff, Seabee Construction, Inc.

    *Dirk D. Haire*, Washington, D.C., with whom were *Michael J. Brewer* and *Isabella S. Capanna*, for defendant-intervenor, Alpine Construction Management, LLC.

    *Patrick S. Angulo*, Trial Attorney, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were *Brett A. Shumate*, Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Acting Director, for defendant.

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information. The parties have conferred and reached an agreement on proposed redactions, which we have adopted. Redactions are indicated by the insertion of brackets in place of original material.

OPINION

Pending in this post-award bid protest are Seabee Construction, Inc.'s ("Seabee") motion for judgment on the administrative record and the government's and Alpine Construction Management, LLC's ("ACM") cross-motions for judgment on the administrative record. This matter is fully briefed, and we heard oral argument on June 12, 2026. For the reasons set out below, we grant the government's and Alpine's motions and deny Seabee's motion.

BACKGROUND[2]

I.    Relevant Facts

    A.    The Solicitation and Invitation for Bids

On July 3, 2025,[3] the government, acting through the United States Department of Veterans Affairs, National Cemetery Administration ("NCA" or the "agency"), issued solicitation No. 36C78625B0038 for the "cemetery expansion and improvements construction project at the Snake River Canyon Nat'l Cemetery" in Buhl, Idaho. Administrative Record ("AR") Tab 8, 100. The NCA sought to award a single firm, fixed price contract in accordance with FAR Part 14, Sealed Bidding. *Id.* The solicitation was issued as an invitation for bids ("IFB") procurement and therefore incorporated by reference FAR 52.214-19, Contract Award–Sealed Bidding–Construction. *Id.* at 100, 114. That FAR provision provides that "[t]he Government will evaluate bids in response to this solicitation without discussions and will award a contract to the responsible bidder whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only price and the price-related factors specified elsewhere in the solicitation." FAR 52.214-19. The IFB called for a one-year period of performance and anticipated commencement of the project within 20 days after contract award. AR Tab 8, 100.

Section 2.1 of the IFB contained the bid instructions. *Id.* at 109. The instructions informed potential bidders of what was required to be contained within their bid packages, including, among other things, a bid guarantee, a

---

[2] These facts are drawn from the Administrative Record.

[3] While the solicitation was originally issued on July 3, 2025, it was later updated and reissued on August 20, 2025.

completed contract administration data sheet, and a completed price/cost schedule. *Id.* A bid that failed to include any of the required documents would be deemed "non-responsive." *Id.* The IFB provided a price/cost schedule that required bidders to provide the bid's overall price as well as a unit price breakout for on-site rock removal. *Id.* at 105.

The IFB informed potential bidders that the project would need to be completed in accordance with the statement of work, specifications, drawings, and other attachments. *Id.* at 100; *see* AR Tab 8a, 184 (scope of work); AR Tab 8b, 188 (bid document specifications); AR Tab 8c, 1235 (revised bid document specifications); AR Tab 8d, 2266 (bid drawings). The specifications outlined the mandatory experience and certification standards that the contractor and its subcontractors were required to meet. The initial specifications were included with the original IFB, *see* AR Tab 8b, 188, and a subsequent amendment revised the specifications in ways immaterial to this case, *see* AR Tab 8c, 1235.

Relevant for our purposes, the specifications set forth standards for the concrete burial crypt installer and the columbarium installer. Section 03 48 21, paragraph 1.6 of the specifications addresses the qualifications for the burial crypt installer. *See* AR Tab 8c, 1427. Subsection C of paragraph 1.6 states:

> Installation Qualifications: Provide written documentation that verifies:
>
> > 1. The installer has been regularly engaged, for at least three years, in installation of pre-cast concrete similar to this project.

*Id.* Section 03 48 24, paragraph 1.5 of the specifications addresses the qualifications for the columbarium unit installer. *See id.* at 1450. That paragraph states:

> A. Precast concrete columbarium unit installer shall have been regularly engaged for at least three years in installation of precast concrete similar to this project. Installers that have previously completed at least three successful NCA columbarium projects within the past 10 years are deemed to be acceptable. Installer to submit successful projects for NCA review. Installer to submit resumes with names of those experienced installers performing the installation.

3

> B. Installer shall have had a minimum of 3 years of experience in installation of niche cover attachment hardware.

*Id.* Importantly, the specifications for the columbarium installer provides that the qualifications are due "[p]rior to the commencement of work." *Id.* at 1448.

On July 20, 2025, the NCA issued Amendment No. 0001. AR Tab 9, 2355. The purpose of the amendment was to "answer the request for information (RFI) submitted from interested bidders." *Id.* Relevant here, one bidder asked: "If the awarded contractor is unable to provide an installer that meets the required qualifications: What are the contractual consequences (e.g., rejection, termination for default, re-bid)?" *Id.* at 2361. The NCA responded:

> No. The requirements for installer qualifications are firm and must be met at the time of contract award and performance. There is no established waiver process under FAR Part 14. Bidders are expected to ensure compliance with all solicitation requirements prior to submission and during contract performance. Any proposed personnel must meet all mandatory qualification criteria as specified.

*Id.* The same bidder also asked whether the agency "offer[ed] any case-by-case evaluation process or temporary waiver mechanism for otherwise qualified personnel?" *Id.* The NCA provided the same response. *Id.*

## B. The Award Process

### 1. Bid Proposals and Bid Opening

In total, the NCA received nine bids in response to the IFB. *See* AR Tab 22, 2654–56. Both Seabee and ACM submitted their respective bids on September 8, 2025, which was the date of the bid opening.[4] ACM's bid was the lowest with an overall bid price of $5,748,586.60. AR Tab 14, 2415. Seabee submitted the second-lowest bid with an overall bid price of $6,294,496.98. AR Tab 19, 2584. Both bids satisfied all of the IFB's express

---

[4] The IFB initially required bids to be submitted by August 25, 2025. AR Tab 8, 100. Later, however, the NCA extended the deadline to September 8, 2025. AR Tab 12, 2374.

requirements; and, importantly, neither bid disclosed proposed installers or installer qualifications. *See id.* at 2413, AR Tab 19, 2575.

### 2. Communications Within the Agency and With ACM

NCA identified ACM as the lowest bidder. *See* AR Tab 24, 2689. Because the IFB called for sealed bidding under FAR Part 14, the contracting officer could not award the contract to ACM without first determining that ACM was responsible and that ACM's prices were reasonable. FAR 14.408-2. The "responsibility" criteria are set forth in FAR 9.104-1. FAR 9.105-1 allows the contracting officer to obtain information to aid in making the responsibility determination and requires the officer to do so "promptly after bid opening."

Auvorie Benson, the contracting officer originally responsible for this solicitation, requested by letter additional information from ACM on September 9, 2025—the day after bid opening. AR Tab 23a, 2660. Mr. Benson informed ACM that ACM's bid was 23% lower than the Independent Government Cost Estimate (IGCE). *Id.* Thus, due to this "variance," the agency sought to "confirm and clarify certain aspects of [ACM's] bid to ensure" that ACM understood the project requirements and was "capable of successfully executing the contract." *Id.* Referencing FAR Parts 9 and 14, Mr. Benson explicitly stated that the request was solely intended to "ensure that [ACM] comprehend[ed] the scope of work and possess[ed] the necessary qualifications to meet the project's demands." *Id.*

Mr. Benson's request tracked the categories of FAR 9.104-1 by requesting information regarding ACM's financial resources, performance record, technical capabilities, cost breakdown, and ability to meet the contract's minimum requirements. Pertaining to the request for information relating to ACM's technical capabilities, the letter stated:

> Technical Capabilities: Submit documentation outlining your technical capabilities, including relevant experience and any certifications held by your key personnel. Specifically, please furnish evidence of having a certified crypt installer, as referenced in specification document 03 48 21 - 3 (Precast Concrete Burial Crypts) for 1.6.C. Additionally, provide proof of a concrete columbarium unit installer with a minimum of 3 years of experience as referenced in specification document 03 48 24 - 4 (Precast Concrete Columbarium Units) paragraphs

> 1.5.A & B. This information is necessary to determine capability as per FAR Part 9.104-2.

*Id.* at 2660–61.

On September 10, 2025, after sending the letter requesting additional information but before ACM responded to that request, Mr. Benson emailed Dimasalang Junio, the NCA Deputy Director of Design and Construction, and Juan Kays, the NCA Project Manager, to inform them that he was "a bit hesitant to award" the contract to ACM. AR Tab 29, 2924. Mr. Benson explained that he could not "find anything that shows [ACM's] true capabilities" and that ACM's past federal contracts were "nowhere near the complexity of Snake River." *Id.* After explaining that he had sent a letter to ACM requesting additional information (as we explained above), Mr. Benson stated:

> Depending on their reply, I highly recommend that we still send it to SBA to get a certificate of competency to allow them to review and see if they can provide us some surety of awarding to them. It may even make them truly review their bid and ensure they can stand by their cost. I know we want to award this prior to Sept 30, but I think we need to be sure before we move forward.

*Id.* In response to this email, Mr. Kays stated: "[Mr. Benson, ACM] is required to hire columbarium and crypt installers with experience. Can you check to see that they'll honor that?" *Id.*

On September 12, 2025, in response to Mr. Benson's letter requesting additional information, ACM provided a document titled "Confirmation and Clarification of Bid Submission." AR Tab 46, 4372. The confirmation and clarification included, among other things, ACM's past performance,[5] its proposed columbarium unit manufacturer, and its planned burial crypt and columbarium unit installers. *Id.* at 4374–77. ACM identified [                                    ] as its planned crypt installer and provided

---

[5] While ACM provided a variety of past performance examples, Seabee argues that "ACM's submission demonstrated an overall absence of horizontal civil construction experience similar to the project scope of work." Pl.'s Mot. J. Admin. R. 13, ECF No. 20.

the relevant pre-cast experience of [         ] and [         ]'s key personnel.[6] *Id.* at 4376–77. Additionally, ACM identified [                                              ] as its columbarium unit manufacturer and installer. *Id.* at 4377.[7]

Later that day, after reviewing ACM's bid confirmation and clarification, Mr. Benson responded to Mr. Kays' prior email and stated: "[T]hey are standing by their bid. However, I still don't think they provided enough to give me confidence in them." AR Tab 29, 2923. He went on to state: "I am asking for more information[,] and I think we should allow SBA to do a Certificate of Competency (COC). I know this delays award[,] but we need to make sure we do our due diligence as much as possible since we did this as a IFB." *Id.* Mr. Kays's response, which brought Jessica Holdren, the principal planner for FourFront Design, Inc. ("FourFront"),[8] into the discussion, identified two issues to discuss: ACM's budget and its capability. *Id.* at 2922. On September 15, 2025, Ms. Holdren responded to Mr. Kays' email and agreed with the concerns Mr. Benson raised. After reviewing ACM's bid confirmation and clarification, Ms. Holdren stated that "[t]heir relevant pre-cast experience does not seem relevant enough to me." *Id.* She further stated that "[t]heir crypt installer and columbarium unit references need more information – we need to see they've installed 3 NCA projects in the past 10 years. I am not aware of [                ] doing any installation on previous projects." *Id.* Later that day, Mr. Benson responded to Ms. Holdren's email and indicated that he had "already reached out to the SBA to provide assistance and do a Certificate of Competency." *Id.* at 2921.

Back again on September 12, 2025, Mr. Benson responded to ACM's bid confirmation and clarification by informing ACM that "several concerns need[ed] to be addressed to determine [its] capability to meet the project's specifications." AR Tab 25, 2696. Specifically, Mr. Benson requested the

---

[6] Seabee argues that "[         ]'s purportedly applicable experience largely consisted of scopes of work inapplicable to NCA projects" and, therefore, ACM "failed to timely identify qualified burial crypt installers at the time it submitted its bid." Pl.'s Mot. J. Admin. R. 13, ECF No. 20.

[7] Seabee argues that because [                    ] "is not an installer, ACM effectively failed to timely include and identify any evidence of a qualified columbarium installer as required by the Solicitation." Pl.'s Mot. J. Admin. R. 13, ECF No. 20.

[8] FourFront served as the designer of record for the project.

7

following information:

- Clarification and documentation proving [                              ]'s experience as an installer.

- Detailed relevant experience of [                    ] as the crypt installer.

- Verification of your role as the prime contractor on past projects and examples of similar scope projects.

- Proof of certifications for the irrigation specification and any other relevant specifications requiring certifications.

- A full list of all subcontractors you plan to use for this project, along with their qualifications and relevant project experience. To ensure transparency and maintain the highest standards for this project, we intend to reach out to the subcontractors provided in your submission to confirm their suitability for the contract requirements. . . . Please confirm if we have your permission to contact these subcontractors directly to carry out this verification. Your timely response will facilitate the continuation of our review process.

*Id.* at 2697. Mr. Benson requested that ACM respond by September 16, 2025, and informed ACM that "[f]ailure to provide the necessary information may result in us referring this matter to the Small Business Administration (SBA) for a Certificate of Competency (COC) review to further assess your qualifications and cost." *Id.*

On September 16, 2025, ACM responded to Mr. Benson's new request and first informed him that ACM had made an error in its bid confirmation and clarification by mistakenly identifying [                ] as both its columbarium manufacturer and installer. *Id.* at 2693. ACM clarified that while [                    ] would serve as the columbarium manufacturer, the columbarium installer would be [                                    ]. ACM also provided a list of previous columbarium projects that [            ] had completed for the federal government. Tab 25c, AR 2706.

Addressing Mr. Benson's second request, ACM attached a "detailed list of relevant precast concrete installation experience of [        ]" and

explained that [          ]'s "experience meets the minimum requirements of specification 03 48 21-3 1.6C because [          ] has been regularly engaged, for over three years, in the installation of pre-cast concrete similar to the project." AR Tab 25, 2693–94. To supplement [          ]'s experience in crypt installation, ACM informed Mr. Benson that it would be bringing in [          ]—project manager at [                              ]— to be a consultant. *Id.* at 2694. ACM attached a list of [                    ]'s relevant experience where he "estimated, managed and installed burial vaults on," which included over twenty projects and 122,011 burial crypts over the last twenty-five years. AR Tab 25d, 2709.

As for Mr. Benson's third request, ACM confirmed that it served as the prime contractor on all the projects that it had listed in its bid confirmation and clarification. AR Tab 25, 2694. ACM then highlighted for Mr. Benson three of ACM's past projects that were "similar in scope and price to the cemetery expansion." *Id.* ACM posited that these three projects were "similar in scope because they include[d] but [we]re not limited to; demolition of existing hardscapes and softscapes, site infrastructure, utilities, site improvements, and landscaping." *Id.*

In response to Mr. Benson's fourth request, ACM stated: "We have verified that the subcontractor [                              ] has the certifications, but on such short notice haven't been able to send us their information." ACM also included that subcontractor's contact information and encouraged the government to contact it if necessary. *Id.*

Lastly, as to Mr. Benson's fifth request, ACM included a list of all its subcontractors and vendors as requested, and ACM also assured Mr. Benson that the subcontractors and vendors "verified their qualifications[] and relevant experience to complete [the] work in accordance with the bid documents (specifications and drawings) at the time of their quotes." *Id.* at 2695. However, ACM took issue with the short notice it was given to collect the required information:

> The Government has not provided adequate time (less than 1.5 business days) to compile and submit all of their qualifications, certifications, and relevant project experience. This type of submittal process is a burden normally accomplished through a Proposal process or during the Pre-construction phase of the submittal process after award of the contract.

9

*Id.* Although it was unable to gather the required information in time, ACM gave the government permission to "contact these subcontractors directly to personally verify these subcontractors' information." *Id.*[9]

On September 17, 2025, Mr. Benson responded to ACM's September 16th email and asked, "If you don't mind, please provide a cost breakdown of your proposal to help us understand your cost better." AR Tab 26, 2736–37. On September 18, 2025, Mr. Benson again emailed ACM and requested, in addition to the cost breakdown, "further information and clarification" regarding ACM's installation consultant from [                                    ], [                    ].[10] *Id.* at 2735. Specifically, Mr. Benson requested that ACM provide the contract numbers for the two most recent projects that were listed as [                ]'s relevant experience and further describe "his direct role with the project and his experience." *Id.*

ACM responded on September 19, 2025, and sent to Mr. Benson seven documents that provided "additional information regarding [                ]'s experiences and performance." *Id.* 2733–34; *see* AR Tab 26a, 2749; AR Tab 26b, 2755; AR Tab 26c, 2759; AR Tab 26d, 2760; AR Tab 26e, 2818; AR Tab 26f, 2820; AR Tab 26g, 2825. ACM then followed up that email with another that attached a document providing "the additional information that [                    ] was able to produce as requested." AR Tab 26, 2733.

Later that same day, ACM sent Mr. Benson a draft of the requested cost breakdown and requested a meeting on the afternoon of September 22, 2025, "to make sure ACM is providing . . . the desired information." AR Tab

---

[9] ACM went on to state:

> ACM is asserting that we have the ability to manage this contract as Prime Contractor and that being deemed nonresponsible would be inconsistent with the FAR . . . . This was advertised as an IFB, and we are now having to provide what seems to be evaluation information without having evaluation criteria to be considered by all parties prior to the bid.

AR Tab 25, 2695.

[10] Mr. Benson also thanked ACM for meeting with the agency.

27, 2850. During that requested meeting,[11] Mr. Benson and Mr. Kays emphasized the project's requirements with a particular emphasis on the "columbarium and [pre-placed crypts] installation." AR Tab 35, 3059. ACM assured the agency that it was "bringing experienced people to the site and if those people for some reason [were not] available, [ACM was] ready to contract with backup people with experience to ensure successful project." *Id.*

On September 22, 2025, Mr. Benson forwarded to Mr. Kays and Ms. Holdren all the information that ACM had provided through the prior email exchanges. *Id.*; *see also* AR Tab 29, 2920; AR Tab 30, 2928. Later that day, Ms. Holdren (from FourFront) responded to Mr. Benson's email. AR Tab 30, 2928. She noted that "[t]he crypt experience does seem better qualified with these documents, provided that [                    ] will be the actual installer on-site throughout construction." *Id.* While pointing out certain concerns with ACM's cost breakdown compared with the estimate, she went on to note that they were "somewhat aligned with [ACM's] total of $5,748,586" and that she otherwise could not "find any obvious discrepancies." *Id.*

### 3. The Replacement of the Contracting Officer and the Subsequent Contract Award

Around this time, the NCA replaced Mr. Benson with Michael Giaquinto as the contracting officer.[12] On September 22, 2025, Mr. Kays brought Mr. Giaquinto up to speed on the status of the procurement and forwarded to him all the information ACM had thus far provided through the prior email exchanges. *See* AR Tab 29, 2920. The next day, ACM emailed Mr. Giaquinto and requested a meeting to discuss whether the information it had provided was adequate and whether the agency needed anything else from ACM. AR Tab 32, 2940. Over the next few days, Mr. Giaquinto and ACM exchanged multiple emails regarding the breakdown of the cost of burial crypt delivery and material and burial crypt installation. *Id.* at 2939–

---

[11] The Administrative Record is not clear as to exactly when the meeting occurred.

[12] Seabee speculates that the NCA replaced Mr. Benson with Mr. Giaquinto to ensure that the award was made before the end of the fiscal year, while the government contends that the change was made due to issues regarding Mr. Benson's workload. The reason for the change is not clear from the Administrative Record. As we explain below, we have no reason to question the replacement.

40.

On Saturday, September 27, 2025, Mr. Kays emailed Mr. Giaquinto to recap a prior discussion between the two that presumably took place on Friday, September 26, 2025. AR Tab 35, 3059. Mr. Kays reiterated that he recommended awarding the contract to ACM. *Id.* While acknowledging that the agency had some prior concerns about ACM, Mr. Kays stressed that ACM "addressed a lot of" those concerns and that ACM assured the agency that it was "bringing experienced people to the site" and "[was] ready to contract with backup people with experience" if necessary. *Id.*

On September 26, 2025, presumably after the discussion referenced in Mr. Kays' September 27, 2025, email, Mr. Giaquinto issued his determination that ACM was responsible. AR Tab 33, 2956. In a separate memorandum issued that same day, Mr. Giaquinto noted that ACM "confirmed all work was covered within their bid and competent subcontractors would be hired and managed and provided bid bonding to ensure proper security for the government." Tab 34, 3058. Thus, after noting that ACM's bid was "within a competitive range" based on the price analysis, Mr. Giaquinto stated: "I hereby determine [ACM's] bid price to be fair and reasonable, and an award should be made to them as this represents the best value to the Government." *Id.* The NCA accordingly awarded the contract to ACM on September 30, 2026. Tab 36, AR 3067.

II.     Procedural History

Seabee filed its complaint on April 1, 2026. It alleges: (1) that ACM's bid failed to comply with the solicitation's requirements, (2) that the agency's responsibility determination was arbitrary and capricious, and (3) that the agency engaged in improper discussions with ACM after bid opening but before contract award.

On April 8, 2026, we granted ACM's motion to intervene. On April 20, 2026, Seabee filed its motion for judgment on the administrative record, and the government and ACM filed their cross-motions on May 15, 2026. The motions are fully briefed, and we heard oral argument on June 12, 2026. At the conclusion of oral argument, we briefly explained why Seabee's motion must be denied and why the government's and ACM's motions must be granted. After oral argument, we entered an order to that effect but delayed entry of judgment pending the issuance of this opinion more fully laying out the court's reasoning.

12

STANDARD OF REVIEW

We review bid protests under the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). Under the APA, we will not disturb an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, we will not set aside an agency's procurement action unless either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine Asia, PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)).

Where a protester argues that an agency's decision lacks a rational basis, the Federal Circuit has made clear that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). As such, "the 'disappointed bidder bears a "heavy burden" of showing that the award decision "had no rational basis."'" *Id.* at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)); *see also Glenn Def. Marine Asia*, 720 F.3d at 907 ("The protestor bears the burden of proving that a significant error marred the procurement in question."). An agency's action lacks a rational basis and is thus arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the action] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Where a protestor argues that the procedure involved a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa*, 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Accordingly, "[i]n applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189 (2022) (quoting *IAP*

*Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022)). And "in the post-award context, the protester must show that there was a substantial chance it would have received the contract award but for" the alleged error. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

Lastly, under Rule 52.1 of the Rules of the United States Court of Federal Claims, we conduct "the equivalent of an expedited trial on a 'paper record, allowing fact-finding by the trial court." *Elec. On-Ramp v. United States*, 104 Fed. Cl. 151, 158 (2012) (quoting *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). We resolve questions of fact "by reference to the administrative record." *Id.* (citing *Bannum, Inc.*, 404 F.3d at 1356).

## DISCUSSION

Seabee's motion puts forth three distinct (although related) arguments. First, Seabee argues that the solicitation, as modified by Amendment 0001, "contained mandatory experience and certification standards . . . related to a bidder's identified precast burial crypt and precast columbarium unit installers" that had to be satisfied at the time of bid submission. Pl.'s Mot. J. Admin. R. 19, ECF No. 20. In Seabee's view, because ACM's first response to Mr. Benson's initial request for information "failed to identify compliant installers with sufficient experience in the respective scopes of work," ACM's bid was nonresponsive. *Id.* at 20. In fact, Seabee goes further and argues that ACM improperly failed "to identify subcontractor-installers *at the time of bid submission*." *Id.* at 20–21 (emphasis added). Therefore, because ACM's bid was nonresponsive, ACM was ineligible for the contract award, and the agency's decision to award the contract to ACM was arbitrary and capricious.

Second, and building off the first, Seabee argues that the agency engaged in impermissible discussions with ACM that allowed ACM to revise its allegedly nonresponsive bid.[13] In other words, by allowing ACM an opportunity to revise and supplement its response to Mr. Benson's initial request for information, the agency improperly allowed ACM to materially alter its bid and thus engaged in impermissible discussions. Third, Seabee argues that the agency's responsibility determination lacked a rational basis

---

[13] As we discuss below, Seabee seemingly merges the concepts of responsibility and responsiveness in making its argument on this point.

for multiple reasons, including that there is no indication in the administrative record that "the outstanding concerns regarding ACM's lack of understanding of the project, lack of technical capability, and related failure to timely satisfy Solicitation requirements" had been resolved at the time of contract award. *Id.* at 26.

As to Seabee's first argument, the government and ACM respond that ACM's bid was responsive because it included all the information required by the bid instructions of the IFB. Amendment 0001, they argue, did not transform the installer requirements into a matter of responsiveness but instead simply confirmed that those requirements were firm and had to be met by the *awarded* contractor.  And to the extent that Amendment 0001 can be read as requiring bidders to identify its installers and provide their experience and qualifications at the time of bid submission, Seabee has at best identified a patent ambiguity and has thus waived the argument under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). Furthermore, even if Seabee did not waive the argument under *Blue & Gold*, Seabee cannot establish prejudice because its bid also did not identify its installers or provide their experience and qualifications.

As to Seabee's second argument, the government and ACM argue that there were no impermissible discussions here because the communications between the agency and ACM constituted permissible clarifications relating to the responsibility inquiry. Indeed, the government and ACM argue that it is impossible for there to have been discussions here because ACM plainly did not alter or revise the terms of its bid.

As to Seabee's third argument, the government and ACM respond that Mr. Giaquinto's responsibility determination was rational because the administrative record contains a plethora of supportive information and further reveals that Mr. Giaquinto reviewed that extensive information.

Seabee acknowledged at oral argument that the crux of its case relies on its interpretation of Amendment 0001. *See* Oral Arg. Tr. 12–14, June 12, 2026. If Amendment 0001 did not impose a requirement that bidders have their proposed installers in place at the time of bid submission (and thus bid opening), then the entirety of Seabee's first argument and most of its second must fail. *See id.* at 12–14, 21–22. Thus, we begin our analysis with Amendment 0001.

15

I.       The Meaning of Amendment 0001

To properly understand Amendment 0001, we must start with the big picture. This was a FAR Part 14, Sealed Bidding solicitation that was issued as an IFB.  It incorporated by reference FAR 52.214-19. Recall that FAR 52.214-19 provides that "[t]he Government will evaluate bids in response to this solicitation without discussions and will award a contract to the responsible bidder whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only price and the price-related factors specified elsewhere in the solicitation." FAR 52.214-19. Thus, the government was obligated to award the contract to the lowest priced, responsive bid so long as that bidder was responsible.

Seabee relies almost entirely on its theory that Amendment 0001 transformed the solicitation's installer requirements into a matter of responsiveness. By regulation, a bid is responsive so long as it "compl[ies] in all material respects with the invitation for bids." *J.E. McAmis, Inc. v. United States*, 164 Fed. Cl. 650, 659 (2023) (alteration in original) (quoting FAR 14.301). Critically, "[t]he responsiveness determination is conducted at bid opening 'based upon the contents of the bid.'" *Id.* (quoting *VMS Hotel Partners v. United States*, 30 Fed. Cl. 512, 514 (1994)). Section 2.1 of the IFB contained the bid instructions. The instructions required bidders to include within their bid packages, among other things, a bid guarantee, a completed contract administration data sheet, and a completed price/cost schedule. Importantly, there is no dispute that, at the time of bid opening, the contents of ACM's bid complied with the IFB's explicit bid instructions. Therefore, the only way ACM's bid can be deemed nonresponsive is if Amendment 0001 made the identification of installers and provision of their qualifications and experience a matter of responsiveness.

It did not. The relevant part of Amendment 0001 was issued in response to a question submitted by a potential bidder: "If the *awarded contractor* is unable to provide an installer that meets the required qualifications: What are the contractual consequences (e.g., *rejection*, *termination for default*, *re-bid*)?" AR Tab 9, 2361 (emphasis added). Thus, the agency's response was elicited by an inquiry that was itself concerned with the consequences an *awarded contractor* would face if it failed to provide an adequate installer. In that context, the agency's response to the question makes sense:

16

No. The requirements for installer qualifications are firm and must be met at the time of contract award and performance. There is no established waiver process under FAR Part 14. Bidders are expected to ensure compliance with all solicitation requirements prior to submission and during contract performance. Any proposed personnel must meet all mandatory qualification criteria as specified.

*Id.* Furthermore, the agency issued the same response to another question: "Does the VA offer any case-by-case evaluation process or temporary waiver mechanism for otherwise qualified personnel?" *Id.*

In other words, a potential bidder asked the agency what would happen if the *awarded contractor* could not satisfy the installer requirements and whether there could be a waiver of such requirements. In response, the agency clarified that because this was a FAR Part 14 procurement, the installer requirements were firm and had to be satisfied by the *awarded contractor*. As such, the agency implored potential bidders to ensure that they would comply with all solicitation requirements—including the installer requirements—before submitting their bids. Again, this makes sense because the solicitation, being a FAR Part 14 procurement, left no room for an awarded contractor to seek to skirt certain inconvenient solicitation requirements, i.e., it would have been futile for a potential bidder to submit a bid with the intention of later seeking some form of waiver of or exception to the installer requirements. Thus, Amendment 0001 did not make the installer requirements a matter of responsiveness—whether due with bid submission or upon request of the contracting officer after bid opening. In fact, the amendment can at most be conceivably interpreted as requiring the contractor to satisfy the installer requirements *at the time* of contract award, but no sooner.

## II.    ACM's Bid Was Responsive

There is no dispute that ACM's bid conformed to the requirements of the bid instructions. Additionally, the burial crypt and columbarium installer requirements are found in the solicitation's specifications, and the specifications "did not govern the content of offers." *Vintage Autoworks, Inc. v. United States*, 132 Fed. Cl. 143, 153 (2017) (holding that the solicitation's instructions to offerors controls what an offeror must include with its offer). Rather the IFB clearly stated through the bid instructions what was required to be included in prospective bids. ACM's bid complied with those

17

instructions. Amendment 0001 did not make the columbarium and burial crypt installer requirements a matter of responsiveness. Thus, Amendment 0001 did not add to what had to be included in prospective bids, nor did it provide ACM (as Seabee argues) with only one chance at providing the installer information to the contracting officer upon request after bid opening. ACM's bid was responsive.

Critically, even if Amendment 0001 rendered the installer requirements a matter of responsiveness such that they were due with the bid submission, Seabee has waived any objection to ACM's hypothetically nonresponsive bid.[14] To the extent Amendment 0001 purports to require bidders to include their proposed installers and their installers experience and qualification with their bids, such a requirement creates a patent ambiguity. The IFB's bid instructions did not require bidders to include installer information. Furthermore, the specifications explicitly required the columbarium installer qualifications to be submitted "[p]rior to the commencement of work." AR Tab 8c, 1448. Thus, Amendment 0001 could have at best created a patent ambiguity as to when the relevant installer information was required. Seabee has waived this argument because it "ha[d] the opportunity to object to the terms of a government solicitation containing a patent error and fail[ed] to do so prior to the close of the bidding process." *Blue & Gold*, 492 F.3d at 1313.

There is another reason why we reject Seabee's argument that Amendment 0001 rendered the installer qualifications a matter of responsiveness that—although required to be satisfied at the time of bid submission—did not have to be provided until requested by the contracting officer after bid opening. It has long been the law that whether a bid is responsive is determined by "the contents of the bid at bid opening." *VMS Hotel Partners*, 30 Fed. Cl. at 514 (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 648–49 (Fed. Cir. 1989)); *see also J.E. McAmis, Inc.*, 164 Fed. Cl. at 660 ("[T]he [contracting officer] is confined to reviewing materials submitted with the bid, as well as available facts at bid opening, in determining responsiveness."). Thus, absent clear evidence to the contrary, of which there is none, we will not interpret the agency's amendment as creating a responsiveness requirement that is contrary to law. ACM's bid was

---

[14] We also note that if Amendment 0001 required bidders to identify their installers and provide their installers' experience and certifications as part of the bid submission process, Seabee has failed to demonstrate prejudice because its bid committed the same "error" as ACM's.

responsive.

III.      The Agency Did Not Engage in Impermissible Discussions

Seabee is correct that discussions are not permitted in the FAR Part 14 sealed bidding context. However, the agency did not engage in discussions with ACM here. As the Federal Circuit has stated, "'discussions involve negotiations' and 'are undertaken with the intent of allowing the offeror to revise its proposal.'" *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1332 (Fed. Cir. 2004) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003)). Indeed, "[t]he 'acid test' for whether an agency has engaged in discussions is whether it provided an opportunity for proposals to be revised or modified." *Conley & Assocs., Inc. v. United States*, 142 Fed. Cl. 177, 184 (2019) (citing *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 229–30 (2008)). Critically, and dispositively, Seabee has conceded that through the communications between the agency and ACM, "there were no changes to the content of the bid submitted by ACM." Pl.'s Reply & Resp. 9, ECF No. 28. Indeed, the agency never gave ACM the option to revise any part of its bid submission. There were no discussions here.

To get around this straightforward analysis, Seabee argues that "ACM's initial post-opening submission failed to identify installers meeting the Solicitation's experience requirements" and thus "the post-opening exchanges between the Agency and ACM allowed ACM the opportunity to materially and impermissibly revise and supplement installer qualifications necessary to satisfy the mandatory experience requirements under Solicitation in violation of FAR Part 14 and relevant Court precedent." *Id.* As we explained previously, however, Amendment 0001 did not make the installer requirements a matter of responsiveness. Thus, ACM was not required to include the relevant installer information within its bid, nor did its bid become nonresponsive when it failed to provide a complete response to Mr. Benson's initial request for information.

Instead, these communications are properly viewed as going to the issue of responsibility, not responsiveness. "Responsibility, under FAR 9.103, is a review of the bidder's 'ability to satisfy its contractual commitments encompassed within its "responsive bid."'" *J.E. McAmis, Inc.*, 164 Fed. Cl. at 660 (quoting *VMS Hotel Partners*, 30 Fed. Cl. at 514). A contracting officer is not only permitted to communicate with a potential bidder in order to determine responsibility but, if necessary, is indeed

required to do so. FAR 9.105-1(a) ("Before making a determination of responsibility, the contracting officer shall possess *or obtain information* sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104." (emphasis added)). Importantly, communications aimed at responsibility "do not constitute discussions." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270 (2021) (quoting *Dyncorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 546–47 (2007)). Consequently, upon request of the contracting officer, a bidder "may present evidence subsequent to proposal submission but prior to award to demonstrate the bidder's responsibility" without such communications constituting discussions. *Lawson Enviro. Servs., LLC v. United States*, 126 Fed. Cl. 233, 247 (2016).

That is exactly what happened here. Mr. Benson made his initial request for information pursuant to FAR Part 9. In fact, the request explicitly tracked the responsibility categories of FAR 9.104-1 by requesting information regarding ACM's financial resources, performance record, technical capabilities, cost breakdown, and ability to meet the contract's minimum requirements. And the focus throughout the communications was ACM's "ability to satisfy its contractual commitments." *J.E. McAmis, Inc.*, 164 Fed. Cl. at 660 (citation omitted). Thus, because the communications went to the issue of responsibility, they necessarily did not constitute discussions.

Seabee nonetheless argues that the communications went "well beyond what a responsibility determination requires or permits" but provides no authority to support such a position. Pl.'s Mot. J. Admin. R. 24, ECF No. 20. On the contrary, the regulations do not limit the contracting officer's authority to seek information regarding responsibility, and it is "the contracting officer"—not a disappointed bidder—who "is the arbiter of what, and how much, information he needs." *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999). Furthermore, even if Seabee is correct that ACM's initial response to Mr. Benson's first request for information lacked sufficient detail to allow an affirmative responsibility determination, there is nothing wrong with ACM supplementing its response through its communications with the contracting officer because "the contracting officer may allow a contractor to cure problems related to its responsibility." *Id.*; *see also Centech Grp. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) ("Responsibility . . . is determined, not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time."). Therefore, the agency

20

did not engage in impermissible discussions with ACM.

IV.    The Agency's Responsibility Determination Was Rational

The only remaining issue, therefore, is whether the agency's responsibility determination was rational. It was. Before explaining our reasoning, however, we must address the threshold issue of whether the installer requirements constituted special standards of responsibility. There are two kinds of contractor responsibility. "First, there are general standards of responsibility, which are expressly set forth in the FAR and are applicable to all contractors." *Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 222 (2013) (citing FAR 9.104–1 (2012)). "Second, in some procurements, there may also be 'special standards of responsibility.'" *Id.* (quoting FAR 9.104–2(a) (2012)). Special standards of responsibility "shall be set forth in the solicitation (*and so identified*) and shall apply to all offerors." FAR 9.104-2(a) (emphasis added). Additionally, special standards of responsibility "must be specific *and objective*." *News Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000) (emphasis added); *see also Chas. H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 720 (1999).

To begin with, Seabee does not argue that the solicitation made the installer requirements special standards of responsibility.[15] Additionally, the government is likely correct that the solicitation did not make the installer requirements special standards of responsibility. Nowhere in the solicitation—including Amendment 0001—are the installer requirements "identified" as special standards of responsibility. FAR 9.104-2(a). Additionally, as the government notes, the solicitation required the contractor to provide installers that had "been regularly engaged for at least three years in installation of precast concrete similar to this project," AR Tab 8c, 1427, 1450, but whether certain precast concrete installation work is "similar to this project" is a subjective, not objective, inquiry. Thus, it seems clear that the solicitation did not make the installer requirements special standards of responsibility.

It appears equally clear to us, however, that the agency, i.e., the first contracting officer (Mr. Benson), thought that the solicitation did make the installer requirements special standards of responsibility. While Mr.

---

[15] Indeed, as discussed previously, Seabee argues that Amendment 0001 rendered the installer requirements relevant to responsiveness, not responsibility.

Benson's initial request for information tracked the general responsibility standards of FAR 9.104-1, he specifically grounded his request for information relating to the installer requirements on the FAR provision allowing a contracting officer to require special standards of responsibility—FAR 9.104-2:

> Specifically, please furnish evidence of having a certified crypt installer, as referenced in specification document 03 48 21 - 3 (Precast Concrete Burial Crypts) for 1.6.C. Additionally, provide proof of a concrete columbarium unit installer with a minimum of 3 years of experience as referenced in specification document 03 48 24 - 4 (Precast Concrete Columbarium Units) paragraphs 1.5.A & B. This information is necessary to determine capability *as per FAR Part 9.104-2*.

AR Tab 23a, 2660–61 (emphasis added). Therefore, it seems that the contracting officer improperly required ACM to provide the installer information as though such information was required under FAR 9.104-2. Indeed, had ACM failed to provide its installer information at that time, and had the contracting officer for that reason concluded that ACM was not responsible, we think it is likely that ACM would have had a solid ground upon which to bring its own bid protest. *See* AR Tab 25, 2695 (ACM protesting that "[t]his was advertised as an IFB, and we are now having to provide what seems to be evaluation information without having evaluation criteria to be considered by all parties prior to the bid").

But in the end, it does not matter. As we explain below, the contracting officer had sufficient information to find that ACM was responsible regardless of whether the solicitation made the installer requirements special standards of responsibility.

Even if Amendment 0001 made the installer requirements special standards of responsibility, it did not specify when the installer information had to be produced and at most provided that the installer requirements had to be satisfied at the time of contract award. And as we noted earlier, responsibility may be determined at any point before contract award and can be based on any information the contracting officer has received up to that time. Therefore, the relevant inquiry for our purposes is whether the contracting officer's responsibility determination, whether special or general, was rational at the time it was made. As such, Seabee's accusation that the agency replaced Mr. Benson with Mr. Giaquinto in order to ensure

that the contract would be awarded before the end of the fiscal year is not only mere speculation but also irrelevant.

At the time Mr. Giaquinto determined that ACM was responsible, the agency had received from ACM detailed information regarding ACM's proposed installers. By way of example, ACM identified [      ] as its burial crypt installer and provided the contracting officer with detailed information regarding [          ]'s relevant precast concrete installation experience. AR Tab 25b, 2705. Likewise, ACM identified [             ] as its columbarium unit installer and similarly provided the contracting officer with detailed information regarding [                ]'s relevant columbarium installation experience. AR Tab 25c, 2706–08. And through the course of extensive communications, ACM supplemented and clarified its relevant information as requested by Mr. Benson and eventually Mr. Giaquinto. Because the administrative record indicates that Mr. Giaquinto had access to—and, as we explain below, indeed reviewed—all the information that ACM had provided during the post-bid opening communications, we cannot say that Mr. Giaquinto's determination that ACM satisfied the installer requirements was irrational.

We also cannot say that the contracting officer's general responsibility determination was irrational. Seabee challenges the general responsibility determination on multiple grounds. First, Seabee argues that "there is no indication . . . within the record that the material concerns regarding ACM's performance capabilities had been addressed, much less resolved, at the time of the determination." Pl.'s Mot. J. Admin. R. 26, ECF No. 20. Specifically, Seabee argues that the contracting officer's "memorandum lacks a supporting justification for his positive decision, as well as reference to evidence confirming the performance capabilities and technical expertise necessary to complete the project that ACM was required to have in place at the time of bid submission." *Id.* Seabee also objects that the memorandum does not identify what information Mr. Giaquinto "reviewed, considered, or relied upon to reach his conclusion." *Id.* Lastly, Seabee argues that the administrative record reveals that Mr. Giaquinto "issued this responsibility determination hastily and without the additional consultation or communication with other Agency officials that a rational and reasonable responsibility determination would demand." *Id.*

"Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision." *John C. Grimberg Co.*, 185 F.3d at 1303. And it is worth

reiterating that "the contracting officer is the arbiter of what, and how much, information he needs." *Id.* Thus, to the extent Seabee argues that there is insufficient evidence in the administrative record to support Mr. Giaquinto's responsibility determination, its challenge must fail. While the agency expressed initial concern regarding ACM's ability to perform the contract, ACM provided thorough information through its bid confirmation and clarification and through subsequent communications with the agency to quell the agency's concerns. In its bid confirmation and clarification, ACM provided information directly pertaining to the general responsibility standards of FAR 9.104-1. And through the thorough communications that followed, ACM consistently provided additional information as requested, including information relating to its past performance, its staff, its columbarium unit installer, its burial crypt installer and burial crypt installation consultant, its other subcontractors and vendors, and its cost. Additionally, the administrative record suggests that the agency and ACM met multiple times after bid opening and before contract award. With all the information ACM provided the agency, we simply cannot say that the evidence in the administrative record was insufficient to support the contracting officer's finding that ACM was responsible, much less that such a determination was arbitrary.

Additionally, Seabee's objections to Mr. Giaquinto's memorandum's asserted lack of "supporting justification," its failure to reference specific evidence, and its failure to "identify any pertinent information that CO Giaquinto reviewed, considered, or relied upon to reach his conclusion," Pl.'s Mot. J. Admin. R. 26, ECF No. 20, is misplaced because he was "'not required to explain the basis for his responsibility determination' at all." *Repeat Consultants Int'l, LLC v. United States*, 172 Fed. Cl. 701, 724 (2024) (quoting *Konecranes Nuclear Equip. & Servs., LLC v. United States*, 165 Fed. Cl. 421, 434–35 (2023)). Rather, Mr. Giaquinto's responsibility determination is entitled to a "presumption of regularity," *Impresa*, 238 F.3d at 1338 (collecting cases), and Seabee has not overcome its "heavy burden" to rebut that presumption, *id.*

Lastly, Seabee's argument that Mr. Giaquinto failed to consult and communicate with other agency officials and failed to review the information ACM had provided to the agency not only fails to overcome the presumption of regularity, but it is also rebutted by the administrative record itself. The record shows that Mr. Giaquinto had access to all the emails exchanged between the agency and ACM—including the attachments with the bulk of the substantive information—as early as September 22, 2025. The record

24

also shows that Mr. Giaquinto communicated directly with ACM prior to making the responsibility determination. Additionally, the record suggests that, prior to the responsibility determination, Mr. Giaquinto met with Mr. Kays to discuss the agency's original concerns regarding ACM, the information ACM provided to address those concerns, and the reasons why that information was enough to alleviate the agency's concerns such that Mr. Kays recommended awarding the contract to ACM. *See* AR Tab 35, 3059. We thus cannot say that Mr. Giaquinto failed to consult with other agency officials and failed to review the evidence available to him. Indeed, the record evidence, coupled with the presumption of regularity to which the contracting officer's responsibility determination is entitled, requires us to reach the opposite conclusion.

In sum, we hold that Seabee has failed to carry its heavy burden to show that Mr. Giaquinto's responsibility determination was irrational. Even if Amendment 0001 made the installer requirements special standards of responsibility, Mr. Giaquinto—at the time of his responsibility determination—had before him sufficient information to find that ACM satisfied the installer requirements. As for the general standards of responsibility, Mr. Giaquinto had more than enough information to make an affirmative responsibility determination, and the record evidence—paired with the presumption of regularity—requires us to conclude that Mr. Giaquinto thoroughly reviewed the information before him and made his affirmative responsibility determination accordingly. Therefore, the responsibility determination was not arbitrary, capricious, or an abuse of discretion.[16]

## CONCLUSION

For the reasons stated above, Seabee's motion for judgment on the administrative record is denied, and the government's and ACM's cross-motions for judgment on the administrative record are granted. The Clerk of Court is directed to enter judgment in Case No. 26-506 accordingly. No costs.

---

[16] Therefore, because Seabee has not succeeded on the merits, it is not entitled to a permanent injunction. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (listing whether "the plaintiff has succeeded on the merits of the case" as the first requirement to show entitlement to a permanent injunction).

<u>s/Eric G. Bruggink</u>
ERIC G. BRUGGINK
Senior Judge